# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        Plaintiff,

v.                                            Case No. 03-CR-289

**CARLTON LEROY**
        Defendant.

## SENTENCING MEMORANDUM

The government charged defendant Carlton Leroy with felon in possession of a firearm, 18 U.S.C. § 922(g), and two counts of distribution of an unspecified amount of crack cocaine, 21 U.S.C. § 841(a)(1) & (b)(1)(C). After granting defendant's motion to suppress the evidence on which the firearm count was based, I dismissed that count on the government's motion. On the day of trial, defendant pleaded guilty to the remaining two counts.

The probation office prepared a pre-sentence report ("PSR"), which recommended a base offense level ("OL") of 26 based on the weight of the drugs involved. According to the PSR, defendant sold a confidential informant ("CI") 3.55 grams of crack on 10/8/03 (count two), and 2.7 grams of crack and 11.33 grams of cocaine powder on 10/10/03 (count three). (The parties later agreed that the PSR had mistakenly transposed the crack and cocaine figures in the 10/10/03 sale, which actually involved 11.33 grams of crack and 2.7 grams of powder.) Defendant and the CI also discussed the sale of one ounce (28.35 grams) of cocaine on 10/14/03, which amount the PSR included as relevant conduct.

Defense counsel filed an objection to the relevant conduct and drug weight determinations in the PSR, arguing that such amounts had not been included in the indictment and either admitted by the defendant or proved to a jury beyond a reasonable doubt.[1] However, as counsel conceded at the sentencing hearing, his argument failed given the holding of the remedial majority in United States v. Booker, 125 S. Ct. 738 (2005). Under the now advisory guidelines, judges may find facts based on a preponderance of the evidence standard. See, e.g., McReynolds v. United States, 397 F.3d 479, 481 (7th Cir.), cert. denied, 73 U.S.L.W. 3709 (U.S. June 6, 2005) ("The remedial portion of Booker held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application."); United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) (stating that judges are entitled to find all facts necessary to determining a guideline or non-guideline sentence).[2]

In the present case, defendant agreed at sentencing that the government had presented sufficient, reliable evidence, set forth in the PSR, to show by a preponderance

---

[1] In his plea colloquy, defendant admitted selling crack and cocaine on the dates alleged but did not admit to any specific amounts (Plea Hr'g Tr. at 13) and, as noted, the indictment alleged no specific amounts.

[2] Despite the applicability of a preponderance standard to guideline determinations, judges should still require a high degree of confidence in any finding that increases the sentence. As Judge Goodwin noted in United States v. Gray, 362 F. Supp. 2d 714, 723 (S.D. W. Va. 2005), in determining what weight to give the advisory guidelines, it may be helpful for the court to consider whether any guideline enhancements are supported by evidence beyond a reasonable doubt. This is not a back-door means of adopting the position of the remedial dissenters in Booker. Rather, it allows the court to give effect to both the merits and remedial majority opinions: federal sentencing is still judge-based, but courts should not impose sentences based on the sort of flimsy evidence that often passed under the old regime.

of the evidence that he sold the CI 3.55 grams of crack on 10/8/03, and 11.33 grams of crack and 2.7 grams of cocaine powder on 10/10/03, supporting an OL of 26. In addition, I found that the proposed sale on 10/14/03 qualified as relevant conduct under U.S.S.G. § 1B1.3(a)(2). It involved the same CI and the same substance and occurred within a few days of the previous transactions. Thus, it was part of the same course of conduct or common scheme or plan. § 1B1.3 cmt. n.9. In any event, even if I excluded the one ounce discussed on 10/14/03, the OL would have been the same. Thus, I overruled defendant's objection and set the base OL at 26 on counts two and three.[3]

Following a 2 level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a), the final OL was 24.[4] Coupled with a criminal history category of VI, the imprisonment range was 100-125 months. Neither party requested a guideline departure, and the government argued for a sentence within the range. However, defendant requested a non-guideline sentence based on the disparity between the guideline penalties for crack and powder cocaine, the small amounts of money involved in the sales and his history of drug use (rather than dealing), and the fact that he had spent several months in state custody prior to being transferred to federal custody to face the present charges. In this

---

[3] Defendant also filed a pro se objection, arguing that he distributed "cocaine base" but not "crack." The Seventh Circuit has held that all crack is cocaine base but not all cocaine base is crack; the stiffer penalties under the statute and the guidelines apply only to crack. United States v. Edwards, 397 F.3d 570, 571 (7th Cir. 2005). However, the problem with defendant's argument was that he pleaded guilty to counts two and three of the indictment, which alleged that he distributed "cocaine base in the form of crack cocaine." Thus, he could not object to the classification of some of the substance sold as crack. In any event, defendant withdrew the objection prior to sentencing.

[4] Because he pleaded on the day of trial, defendant did not qualify for the third level reduction under § 3E1.1(b).

3

memorandum I discuss the parties' contentions and set forth the reasons for the sentence imposed.

## I. SENTENCING PROCEDURE

In imposing sentence, I consider the factors set forth in 18 U.S.C. § 3553(a), which include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

My task is to "'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2).'" United States v. Galvez-Barrios, 355 F. Supp. 2d 958, 960 (E.D. Wis. 2005) (quoting 18 U.S.C. § 3553(a)). I typically group the § 3553(a) factors into three categories: the nature of the offense, the history of the defendant, and the needs of the public and any victims. I analyze each category and in so doing consider

4

the specific statutory factors under § 3553(a), including the advisory guidelines. <u>United States v. Ranum</u>, 353 F. Supp. 2d 984, 989 (E.D. Wis. 2005).

## II. APPLICATION

### A. Nature of Offenses

Defendant distributed two fairly small amounts of cocaine and crack to a paid government informant for a total of $450, and arranged for another small sale. The evidence did not suggest that defendant was a large scale dealer. In fact, on each occasion, the CI sought out defendant (though defendant was more than happy to oblige). Nor did the offenses involve violence, threats or weapon possession.[5] Thus, the offenses were not aggravated.

### B. Character of Defendant

Defendant was thirty-two years old, unmarried, and the father of two children. He owed almost $15,000 in back child support, though he did seem to be involved in his children's lives. Prior to his arrest he lived with his girlfriend and their three year old child. He had a very serious criminal record, including convictions for burglary, armed robbery, felon in possession of a firearm (twice), and possession of cocaine (twice). He committed the instant offenses while on probation and within a few months of his release from the house of correction. Clearly, lesser penalties and community supervision had not proven effective in correcting his conduct.

---

[5]As noted, defendant was charged with felon in possession of a firearm. However, the firearm was not linked to the two drug deals at issue, and the government did not argue that the sentence should be enhanced based on the gun. Defendant denied that the gun, found after his 11/4/03 arrest in a house he occupied, was his.

5

Defendant dropped out of high school but later got a GED and took additional classes. However, his employment record was spotty. He stated that he had been self-employed as a barber for the past ten years, but he was not certified and did not substantiate this employment. He worked as a carpet cleaner for about a year in 2002 and 2003, and a telemarketer for five months in 1999 and 2000. The PSR listed several other very short-term jobs.

Defendant seemed to have a problem with cocaine but completed a treatment program while on pre-trial release. All of his drug tests, save one, were negative.

Prior to sentencing, I received various letters supporting defendant. Tarena Franklin, a family friend, wrote that defendant came from a good family – his mother is a police officer – and he was not a typical "street thug." Rita McClain, an aunt, said much the same. Defendant's sister wrote that he was a kind person and good father and that he assisted the family, particularly a grandmother who had Alzheimer's. She believed that he was using drugs rather than selling and asked that he be allowed to remain in the community under supervision. She offered to help him and was present at sentencing. Defendant's father wrote that defendant had done well on pre-trial release and was trying to make the right choices in life.

At sentencing, defendant showed some insight into his conduct. He stated that the recent death of a close friend made a big impression on him, and he poignantly described the emotional difficulty of visiting with his three year daughter while in jail: he could neither touch her or tell her when he would come home.

6

## C. Needs of Public

Defendant seemed to pose a risk of re-offending and a danger to the public. Further, a substantial period of confinement was necessary to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment. I recommended to the Bureau of Prisons that defendant receive drug treatment but, other than that, he did not appear to have particular educational, vocational or other treatment needs. I also imposed a drug aftercare program as a condition of supervised release.

## D. Consideration of Guidelines

The guidelines called for a prison term of 100-125 months. This range was driven largely by the fact that defendant sold crack. As I discussed in United States v. Smith, 359 F. Supp. 2d 771, 777-82 (E.D. Wis. 2005), the guidelines treat 1 gram of crack the same as 100 grams of powder cocaine. Relying primarily on data collected by the Sentencing Commission, I determined in Smith that this 100:1 crack to cocaine ratio was unreasonable and created unwarranted disparity. Consistent with the Sentencing Commission's latest recommendation, in Smith I followed a 20:1 ratio, which narrowed the gap but recognized the possible differences between the two substances. I concluded that it would be appropriate to do the same in the present case.

The government objected to my decision. First, it contended that I could not rely on § 3553(a)(5), which directs the court to consider the Commission's policy statements, because the Commission never set forth its crack-cocaine findings or the 20:1 ratio in a guideline policy statement. However, I did not rely on that statutory sub-section. Rather, I concluded that § 3553(a), which affords the court discretion to question whether the

7

guideline range is greater than necessary to satisfy the purposes of sentencing, and § 3553(a)(6), which permits the court to tailor the sentence to avoid unwarranted disparity, provided the statutory authority for the adjustment.

As I explained more fully in <u>Smith</u> and need not repeat here, there is no persuasive penological or scientific justification for treating 1 gram of crack the same as 100 grams of powder. 359 F. Supp. 2d at 777. The Sentencing Commission studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported. Specifically, the Commission concluded that: (1) the prevalence of aggravating factors in crack cases does not differ substantially from powder cocaine cases, <u>id.</u> at 778-79; (2) any pharmacological differences between crack and powder do not justify the disparity in penalties, <u>id.</u> at 779-80; (3) in comparison to the mid-80s, the use of crack has decreased, <u>id.</u> at 780; (4) the unjustifiably harsh crack penalties disproportionately impact on black defendants and have increased racial disparity in federal sentencing, contrary to one of the Sentencing Reform Act's primary goals, <u>id.</u> at 780; (5) the disparity in sentences involving crack and powder brings irrationality into the criminal justice system, allowing guideline sentences to vary widely depending on whether the offender had cooked the powder into crack by the time of arrest; and (6) the 100:1 ratio results in lesser sentences for large scale suppliers of powder cocaine than the street level crack dealers who exist below them in the hierarchy of distribution, <u>id.</u> at 780-81. Thus, none of the previously offered reasons for the 100:1 ratio withstand scrutiny. In light of these well-supported findings by the Commission, a court acts well within its discretion under § 3553(a) in sentencing below the guideline range to account for the unreasonable inflation of sentences called for in crack cases. A court also acts well within its discretion in

concluding that the guidelines create unwarranted disparity between crack and powder cocaine defendants, as well as racial disparity, contrary to § 3553(a)(6).

Second, the government argued that I could not modify the sentence because Congress had approved the 100:1 ratio. However, although Congress enacted mandatory minimum penalties that incorporate the 100:1 ratio, see 21 U.S.C. § 841(b)(1)(A) & (B), I did not sentence defendant below a statutory mandatory minimum.[6] Rather, based on the § 3553(a) factors, I imposed a non-guideline sentence. The fact that the Commission forwards its guidelines to Congress does not make the guidelines any less advisory.[7] As the Supreme Court made clear in Booker and Blakely, whatever their source, mandatory guidelines that require judicial fact-finding violate the Sixth Amendment. The Court solved the problem by making the federal sentencing guidelines advisory. This means that while I must consider the guidelines, as I did in the present case, I am not bound by them.

At bottom, the government's argument amounted to an assertion that even though Booker made the guidelines advisory, and even though the Sentencing Commission and most other students of the matter have concluded that the 100:1 ratio between crack and powder is unreasonable, courts are obliged to maintain such ratio. However, this assertion misreads both Booker and § 3553(a). Booker directs courts to consider the guidelines but permits them to tailor sentences in light of other statutory concerns. Booker, 125 S. Ct.

---

[6]At sentencing, the government stated that, because I found by a preponderance of the evidence that the count three offense involved more than five grams of crack, a five year mandatory minimum could apply. Because I concluded that § 3553(a) called for a sentence of more than five years, I did not have to address this issue.

[7]While the Commission must submit proposed guidelines or amendments to Congress, they automatically take effect within six months unless Congress acts. 28 U.S.C. § 994(p).

at 756-57. Among these statutory concerns are "the need to avoid unwarranted sentence disparities," § 3553(a)(6), and to impose sentences "sufficient but not greater than necessary to comply with the purposes set forth in paragraph (2)," § 3553(a). In the present case, after carefully reviewing the history of 100:1 ratio, I concluded that application of the guidelines would create unwarranted disparity "among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), and would result in a sentence "greater than necessary to comply with the purposes set forth in paragraph (2)," § 3553(a).

Treating defendants who possess two virtually identical substances so differently is, in my view, unreasonable.[8] Perhaps the ratio is not <u>so</u> insane as to violate the Constitution, see, e.g., United States v. Frazier, 981 F.2d 92 (3d Cir. 1992), but I did not hold U.S.S.G. § 2D1.1(c) unconstitutional. Neither did I strike down 21 U.S.C. § 841(b)(1). Rather, I exercised the discretion afforded by Booker to decline to follow the advisory guideline. In so doing, I did not simply reject the guideline because I did not like it, personally thought it too harsh, or disagreed that crack posed special problems. Rather, after carefully reviewing the data collected by the Sentencing Commission, as well as other

---

[8]Several courts have agreed in post-Booker cases, see, e.g., United States v. Castillo, No. 03 Cr. 835, 2005 U.S. Dist. LEXIS 9780, at *12-13 (S.D.N.Y. May 20, 2005); Simon v. United States, 361 F. Supp. 2d 35, 44 (E.D.N.Y. 2005) (collecting cases), and even those judges who do not feel that it is appropriate to exercise their discretion to remedy the problem are "deeply troubled by . . . the crack cocaine Guidelines." United States v. Tabor, 365 F. Supp. 2d 1052 (D. Neb. 2005). Indeed, one is hard pressed to find anyone willing to defend the 100:1 ratio on the merits (as opposed to merely deferring to Congress and the Commission on this issue). "Even the House sponsor of the bill that rejected the Commission's initial effort to eliminate the disparity stated that the Commission should close the gap though 'not completely eliminate it.'" Smith, 359 F. Supp. 2d at 781 (quoting statement of Rep. McCollum).

10

cases and authority, I concluded that the 100:1 ratio did not produce a sentence consistent with the § 3553(a) factors, and that the 20:1 ratio last proposed by the Commission was reasonable. In making this determination, I did not substitute my personal views for the considered position of the Sentencing Commission. Rather, I gave weight to the Commission's position because it had studied the issue and acquired expertise.

On a more general level, the government's position seemed to be that Booker did nothing more than slightly expand a court's authority to depart from the guidelines based on unusual factors the Commission did not adequately consider. Under this view of the advisory guideline regime, courts continue to have no role in the determination of sentencing policy as they had none under mandatory guidelines. As I have discussed elsewhere, this is a cramped view that neither Booker nor § 3553(a) supports. See Ranum, 353 F. Supp. 2d at 987 (holding that because the "guidelines are not binding . . . courts need not justify a sentence outside of them by citing factors that take the case outside the 'heartland' [and] are free to disagree . . . with the actual range proposed by the guidelines"); see also Galvez-Barrios, 355 F. Supp. 2d at 961-62 (critiquing 16 level enhancement under § 2L1.2(b)(1)(A)). Because this issue is of fundamental importance to the new sentencing system, and is likely to recur, I believe it appropriate to analyze it in some detail.

In Booker, the Court stated:

Without the "mandatory" provision, the Act . . . requires judges to take account of the Guidelines together with other sentencing goals. The Act . . . requires judges to consider the Guidelines "sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant," the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. And the Act nonetheless requires judges to impose

11

sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care.

125 S. Ct. at 764-65 (internal citations omitted, emphasis added).

In response to the claim that its holding would "produce a discordant symphony," the remedial majority stated:

> The Sentencing Commission will continue to collect and study appellate court decisionmaking. It will continue to modify its Guidelines in light of what it learns, thereby encouraging what it finds to be better sentencing practices. It will thereby promote uniformity in the sentencing process.

Id. at 766. The Court acknowledged that its holding would not provide the degree of uniformity Congress originally sought, however, it concluded that "providing appellate review, would tend to iron out sentencing differences." Id. at 767.

> As we have said, the Sentencing Commission remains in place, writing Guidelines, collecting information about actual district court sentencing decisions, undertaking research, and revising the Guidelines accordingly. The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. . . . . The courts of appeals review sentencing decisions for unreasonableness. These features of the remaining system, while not the system Congress enacted, nonetheless continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.

Id. at 767 (internal citations omitted).

The above-quoted statements make clear that sentencing courts must consider all of the § 3553(a) purposes and factors and sentence defendants in light of them. The passages also indicate that the Sentencing Commission continues to have an important role and is to study the sentencing practices of courts, learn from such practices and, where appropriate, amend the guidelines.

12

An analysis of § 3553(a) also supports my view that Booker granted more than a slightly enhanced departure authority. The statute is best understood as operating sequentially. First, the court must consider the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1), in other words, the specifics of the case before it.

Second, the court must evaluate the specifics of the case in light of more general societal needs, i.e. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant, § 3553(a)(2)(A)-(C).

Third, the court must translate its findings and impressions into a numerical sentence. In so doing, it considers the kinds of sentences available, § 3553(a)(3), the sentencing range established by the Sentencing Commission, § 3553(a)(4), any pertinent policy statements issued by the Sentencing Commission, § 3553(a)(5), and any restitution due the victims of the offense, § 3553(a)(7). In imposing a specific sentence, the court must also consider the need to avoid unwarranted sentence disparities, § 3553(a)(6). The ultimate directive contained in the statute is, after considering all of the above circumstances, to impose a sentence sufficient, but not greater than necessary, to comply with the purposes in § (a)(2).

The statute plainly authorizes the court to consider much more than whether the facts of the case before it are unusual (i.e., outside a guideline heartland). The court must evaluate the offense and the offender in light of societal needs and the overall purposes of sentencing, as set forth in the Sentencing Reform Act. It must also seek to ensure that the sentence imposed is not unreasonably disparate to those of others convicted of similar

13

crimes. In making the latter inquiry, the court may consider whether the guidelines are a source of disparity. See United States v. McGee, Nos. 01-2493, 01-3071, 01-3978, 01-4027, 01-4139, 01-4235, 02-1130, 02-1136, & 02-2153, 2005 U.S. App. LEXIS 10178, at *56-57 (7th Cir. June 3, 2005) (noting that under § 3553(a)(6) courts can consider disparity in sentences under the guidelines).

Further, the statute makes plain that the <u>court</u> must consider the listed factors. It may not delegate that task to another agency, such as the Sentencing Commission. Neither may the court assume that the guidelines take into account all of the purposes of sentencing. If that were so, five of the seven statutory sub-sections in § 3553(a) would be superfluous. In sum, the statute requires courts to play a greater role than simply deferring to the Commission's policy choices.

As Professor Freed noted many years before <u>Booker</u>, in reference to the court's then-existing departure authority:

> [I]f the guideline raises a question of "fairness," or sets a penalty range that seems too low or too high – if it seems either insufficient or "greater than necessary" – the court may consider a departure. In such cases, the court's inquiry should focus on whether the Commission adequately considered the kind or degree of circumstances, aggravating or mitigating, present in the case. . . . This congressional invitation for judicial review of a guideline's applicability is a matter of paramount importance. Review is not limited to determining whether the Commission merely "considered" – i.e., mentioned – a subject. Rather, the test focuses on the adequacy of the consideration. <u>It holds the Commission accountable with respect to the quality of the guideline and assures courts that they need not follow ill-considered limitations on their discretion.</u>
>
> By scrutinizing the three permissible sources – the guidelines, the policy statements, and the commentary – for indications of how carefully the Commission considered the substance of the guideline at issue, a district judge fulfills a basic statutory purpose: to maintain "sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing

14

> practices." Unfortunately, such scrutiny is infrequent. Judicial oversight of the Commission has not been pursued with sufficient diligence with respect to the process of guideline formulation, or to the substantive instructions governing guideline content. As a consequence, the Commission has not been pressed to meet its burden of justifying those aspects of the guidelines that cause difficulties in the courts.
>
> . . . Many judges seem to assume that the Guidelines Manual fully codifies the law of sentencing and that nothing can be done about a troublesome guideline unless Congress acts. Principles of administrative law, which courts usually follow when reviewing agency actions, seem to be forgotten when judges themselves are called upon to apply questionable sentencing regulations. It is paradoxical that district judges who are outspoken critics of the guidelines have been lax in responding to Congress' invitation to review guideline validity.
>
> . . . Searching review is especially appropriate given Commission policy statements indicating a willingness to revise the guidelines based on reasoned departures by district courts.

Daniel J. Freed, <u>Federal Sentencing in the Wake of Guidelines: Unacceptable Limits on the Discretion of Sentencers</u>, 101 Yale L.J. 1681, 1698-1700 (June 1992) (emphasis added, footnotes omitted). Now that the guidelines are advisory, courts are surely free to take up Professor Freed's suggestion, critically evaluating the guidelines in light of their experience.

Read together and read properly, <u>Booker</u> and § 3553(a) create a sentencing system under which courts and the Commission will engage in an active and ongoing dialog concerning sentencing. Courts and the Commission will assist each other in developing a fairer sentencing system or, as the <u>Booker</u> Court put it, "better sentencing practices." Under this system, courts will not be disconnected from the determination of sentencing

15

policy as they were under the mandatory guideline regime. This system contains great promise for the development of a more just sentencing system.[9]

Thus, in the present case, I rejected the government's argument that I could not consider the disparity in penalties created by the guidelines. Following a 20:1 ratio, I imposed a non-guideline sentence as if the base offense level on count one had been 22 rather than 26.[10] I did not alter the guidelines, which I had already determined. Rather, I imposed a non-guideline sentence using a 20:1 ratio to create a reference point. Taking this into account, the offense level after the reduction under § 3E1.1 would have been 20 and the imprisonment range 70-87 months.

**E.    Imposition of Sentence**

Given defendant's serious record and the fact that lesser sanctions had not altered his behavior, I found the modified range sufficient but not greater than necessary. I saw no reason to otherwise reduce the sentence from the advisory range. I imposed a sentence at the low end to account for defendant's positive personal qualities as detailed in the letters and the insight into his conduct he displayed at sentencing.

I rejected defendant's other arguments for a non-guideline sentence.

---

[9]Because courts will play a more important role in sentencing under the advisory guideline regime, I believe that they have a larger responsibility in assisting the Commission in its ongoing obligation to critique and tweak the guidelines. Courts can fulfill this obligation by sharing their experiences in the form of written decisions that discuss the strengths and weaknesses of particular guidelines.

[10]Under the guidelines, 1 gram of cocaine converts to 200 grams of THC. Thus, using a 20:1 ratio 1 gram of crack would equal 4000 grams of THC. In the present case, defendant dealt a total of 14.88 grams of crack, which converted to 59.52 kg of THC. The 2.7 grams of cocaine he sold converted to .54 kg of THC, for a total of 60.06 kg of THC. This weight of THC carried a base OL of 22. U.S.S.G. § 2D1.1(c)(9). The relevant conduct amount of 28.35 grams of cocaine (5.67 kg of THC) did not affect the analysis.

Defendant first argued that he was not a regular dealer, but rather a user who sold drugs sporadically. Perhaps this was true, although there was evidence that defendant told the CI he could get more drugs from a source in Chicago. In any event, while this may constitute a reason for sentencing at the low end, I did not see it as a significant mitigating factor. The guideline range was supported by the drugs defendant actually sold the CI, and I modified that range to account for the crack–cocaine disparity. Further, as the government pointed out, while the dollar amounts involved were relatively low, the evidence showed that defendant gave the CI a break on the price.

Defendant also argued that I should reduce his sentence to, in effect, award him credit for time spent in state custody. Defendant was held in state custody on a probation hold from 11/5/03 to 1/16/04, when a state ALJ declined to order revocation. He remained in state custody on state charges of felon in possession of a firearm and possession of THC - 2d offense from 1/16/04 until 1/30/04, when he was transferred to federal custody to answer the instant indictment. For several reasons I did not believe it appropriate to reduce the sentence on this basis.

First, the probation revocation proceedings focused on the 11/4/03 arrest of defendant, pursuant to which officers recovered a handgun. That gun formed the basis for count one in this case – felon in possession, which was dismissed. Defendant was not punished for the gun in the present case. It did not appear that the state ALJ considered the drug deals from 10/8/03 and 10/10/03, the focus of this case. Thus, the state probation revocation proceedings were not based on the same conduct at issue in this sentencing.

Second, in a situation in which a defendant is on probation at the time he commits the instant offense and has had that probation revoked, the guidelines recommend a

17

consecutive sentence for the instant offense. U.S.S.G. § 5G1.3 cmt. n.3(C). That recommendation was not binding on me, but in this case I considered it appropriate given the differing conduct at issue.

Finally, although defendant may have remained in state custody for about two weeks after revocation was not ordered, I declined to adjust the sentence on that basis given that I had already reduced the sentence significantly based on the crack to powder disparity, I imposed a sentence at the low end of range as effectively modified, and the lack of overlap in conduct. As noted, the state charges were felon in possession of a firearm and possession of THC - 2d offense, not the same as he was sentenced for in the present case. Thus, an adjustment was not appropriate.

Therefore, I committed defendant to the custody of the Bureau of Prisons for 70 months. Other conditions of the sentence appear in the judgment.

**SO ORDERED**.

Dated at Milwaukee, Wisconsin, this 20th day of June, 2005.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

18

Case 2:03-cr-00289-LA   Filed 06/20/05   Page 18 of 18   Document 83